## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| MAURA MADDEN, | |
| Plaintiff, | |
| v. | No. 1:23-cv-14163 |
| | Judge Franklin U. Valderrama |
| AMAZON.COM SERVICES, LLC, | |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

Defendant Amazon.com Services LLC (Amazon) owns and operates an approximately 140,000 square foot warehouse (the Facility) on the westside of the City of Chicago, where it receives, stores, and delivers goods intrastate. Plaintiff Maura Madden (Madden), a Chicago resident and homeowner, lives within 1,200 feet of the Facility. Madden filed this suit in state court seeking a declaration that Amazon's use of the Facility is a Freight Terminal for which Amazon needs, but does not have, a special use permit, in violation of the City of Chicago's Zoning Ordinance (CZO).

Amazon removed the case to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a)(1). R. 1, Notice of Removal. Before the Court is Madden's motion for a preliminary injunction against Amazon, to enjoin the operation of the Facility until Amazon receives a special use permit. R. 1-1,[1] Exh. A at 29 (Motion). For the reasons stated below, the Court denies Madden's Motion.

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

Amazon owns and operates an approximately 140,000 square foot Facility at 1260 North Kostner, in Chicago, Illinois. R. 1-1, Exh. A at 3 (Compl.) ¶¶ 1, 5. The Facility sits along Division Street between Kostner Avenue and Kilbourn Avenue. *Id*. ¶ 17. Madden is a Chicago resident and homeowner whose home is located less than 1,200 feet from the property line of the Facility. *Id*. ¶ 2.

In December 2020, Venture One Development, LLC executed a building permit application (the Application) to build a "44 foot high, 141,360 square foot industrial building for the receiving, storage, and shipping of commercial products." Compl. ¶ 22. The Application lists the proposed zoning use as "Industrial Use Group - Warehouse and Freight Movement (except as more specifically regulated)." *Id*. ¶ 25. The building permit was submitted on behalf of Amazon. *Id*. ¶ 23. The City of Chicago's building permit application contains a section where the applicant must describe in narrative form the proposed use for structures and facilities to be built. *Id*. ¶ 26. In the Application, the applicant's use narrative reads, in total, "[r]eceiving, storage, and shipping of commercial products." *Id*. On June 14, 2021, the property was conveyed to Amazon. *Id*. ¶ 11.

In a statement made to the Chicago Sun Times published on August 28, 2023, the Facility was described as being designed to receive, store and ship common household items that people want quickly. Compl. ¶ 27. When Amazon answered the Complaint, it admitted that it would receive and store goods at the Facility and deliver them intrastate. R. 10, Answer ¶ 30. Based upon the briefing of this Motion,

the Court understands the description of the Facility by Amazon is no longer prospective, as the Facility is currently in operation. R. 11, Resp. at 3.

The Facility sits in Planned Manufacturing District (PMD) #9, also known as the "Northwest PMD." Compl. ¶ 20. A PMD is a zoning designation used for complex or high-intensity industrial uses, with specific zoning, density, use, and building guidelines applicable to developments within that district. *Id*. ¶ 21. The CZO "includes 'use tables' which indicate what uses are *permitted uses*, as indicated by a 'P' in the use table, meaning allowed to be built and operated without further approval other than building and engineering permits[.]" *Id*. ¶ 33 (emphasis in original). The CZO also lists prohibited uses, "indicated by a '-' in the use table, meaning not allowed to be built or operated under any circumstances[.]" *Id*. The CZO also lists special uses, "indicated by an 'S' in the use table, meaning allowed only via a 'special use process,' whereby a project must be approved by the City's Zoning Board of Appeal ('ZBA')." *Id*.

The ZBA's "special use process requires, among other things, notice be sent certified mail to residents within a certain distance; that notice be posted at the property site; that the project meet a variety of criteria; and that the ZBA vote to grant the special use permission." Compl. ¶ 34. A special use permit is a discretionary permit. *Id*. ¶ 35. Amazon admits it has neither applied for nor received any special use permit for the Facility. Answer ¶ 44.

The CZO lists "Freight Terminal" as a special use in the PMD-9 one. Compl. ¶ 36. The "Freight Terminal" use is a specific subcategory listed under the general

3

category of "Warehouse and Freight Movement (*except as more specifically regulated*)." *Id*. ¶ 37 (emphasis in original). The CZO defines "'Freight Terminal' as "[a] building or area in which freight is collected and/or stored for in intrastate or interstate shipment." *Id*. ¶ 38. The word "freight" is not defined in the CZO. *Id*. ¶ 39. However, the CZO provides that "[w]ords that are not defined in Chapter 17-17 have the meaning given in the latest edition of Merriam Webster's Collegiate Dictionary." *Id*.

On August 29, 2023, Madden filed this suit in state court against Amazon seeking a declaratory judgment under 65 ILCS 5/11-13-15 that Amazon's Facility is in ongoing violation of the CZO. Compl. ¶ 1. Two weeks later Madden filed a motion for preliminary injunctive relief against Amazon, asking the Court to enjoin Amazon from its continuing violation of the CZO. Mot. ¶¶ 3–4. This fully briefed Motion is before the Court.

## Jurisdiction

Before the Court addresses Madden's substantive arguments, the Court must first examine the basis for federal jurisdiction. Although not raised by Madden, "[i]t is the responsibility of a court to make an independent evaluation of whether subject matter jurisdiction exists in every case." *Foster v. Hill*, 497 F.3d 695, 696–97 (7th Cir. 2007).

This case arises under Illinois law, specifically 65 ILCS 5/11-13-15 (the Enforcement Statute).[2] However, Amazon removed this action on the basis of federal

---

[2]Plaintiff describes this statute as the "Enforcement Statute," which name the Court uses throughout this Memorandum Opinion and Order for purposes of resolving this Motion only.

diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). To meet the requirements of diversity jurisdiction, the matter in controversy must exceed $75,000, exclusive of interest and costs, and there must be complete diversity of citizenship of the parties. *Id.*

Here, based on the Verified Complaint, and the information provided by Amazon in its Notice of Removal, the Court is satisfied that Madden and Amazon are citizens of different states. Compl. ¶¶ 8, 10; Notice of Removal ¶ 7.

Amazon contends the matter in controversy exceeds $75,000, relying upon the "either viewpoint rule," which permits the Court to assess the amount-in-controversy by "looking at either the benefit to the plaintiff or the cost to the defendant of the requested relief[.]" Notice of Removal ¶ 9 (citing *Uhl v. Thoroughbred Tech. & Telecomm., Inc.*, 309 F.3d 978, 983 (7th Cir. 2002); *see also Smith Prod. Co. v. Baldwin*, 106 F.3d 403 (7th Cir. 1997) (unpublished) (cleaned up)[3] ("In a declaratory judgment action, we measure the amount in controversy by the value of the 'object of the litigation.' Under the 'either viewpoint rule,' we can calculate the value of the object of the litigation from the viewpoint of either party.")). Given the nature of the requested relief by Madden–enjoining Amazon from using the Facility–Amazon maintains that its damages in complying with the relief sought, including the time it

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

would take to secure a special use permit, and the resulting lost sales if the Facility is non-operational, would far exceed $75,000. Notice of Removal ¶¶ 12–13.[4]

Madden does not take a position on whether the requirements of diversity jurisdiction are met. Nor did she file a motion to remand.

The Court agrees with Amazon that in applying the "either viewpoint rule," the cost to Amazon in complying with the requested injunctive relief would exceed $75,000. *See Uhl*, 309 F.3d at 983. Therefore, the Court finds that Amazon satisfies the amount-in-controversy requirement.

The Court, having satisfied itself that it has subject matter jurisdiction over this matter, now turns to analyzing what standard applies to evaluating Madden's Motion.

## Legal Standard

Before the Court can delve into the merits of the motion, the Court must resolve the applicable preliminary injunction standard.

Madden argues that the Enforcement Statute creates a modified legal standard for the granting of a preliminary injunction. R. 1-1, Exh. A at 32 (Memo.) at 3. A complaint that seeks an injunction based on a statute, submits Madden, need not allege all of the factors for a preliminary injunction. *Id*. Specifically, she argues, a plaintiff is not required to plead or prove irreparable harm and an inadequate

---

[4]Amazon did not attach any affidavit with its Notice of Removal in support of this claimed amount. However, Amazon did include the Declaration of Amazon employee Emmy Remy, Senior Manager, Transactions, to its Response opposing Plaintiff's requested preliminary injunction. R. 11-1, Remy Decl. Remy's Declaration includes projected losses if operations were ordered to be shut down, which support that the cost to Amazon of the requested relief by Plaintiff would exceed $75,000. *Id.* ¶ 14.

remedy at law. *Id.* (citing *Riverdale v. Allied Waste Transp.*, 777 N.E.2d 684, 688 (Ill. App. Ct. 2002); *People v. Fiorini*, 574 N.E.2d 612, 623 (Ill. 1991); *County of DuPage v. Gavrilos*, 834 N.E.2d 643, 648–49 (Ill. App. Ct. 2005)). Rather, Madden submits that she need only show that the statute was violated, and that the statute allows injunctive relief. *Id.* at 3–4. The Enforcement Statute, posits Madden, allows for private individuals to step into the shoes of a municipality to enjoin violations of a zoning code. *Id.* at 4. And the plain text of the statute, contends Madden, supports the proposition that she need only show a likelihood of success in showing the underlying violation to obtain an injunction. *Id.*

Predictably, Amazon disagrees, arguing that contrary to Madden's suggestion, federal courts apply the familiar four-factor test in determining whether to issue a preliminary injunction. Resp. at 7–8 (citing *Holbrook Mfg. LLC v. Rhyno Mfg. Inc*, 497 F. Supp. 3d 319, 333 n.4 (N.D. Ill 2020)). The exception cited by Madden, asserts Amazon is only applicable where the movant in an Enforcement Statute action is a unit of government and not a private litigant. Resp. at 8–9 (citing, among other cases, *People ex rel. Sherman v. Cryns*, 786 N.E.2d 139, 149 (Ill. 2003) ("Where, as here, the State or governmental agency is expressly authorized by statute to seek injunctive relief, the traditional equitable elements necessary to obtain an injunction need not be satisfied.")). Moreover, argues Amazon, even Illinois courts apply the traditional test for injunctive relief based on the Enforcement Statute where the plaintiff is a private litigant. Resp. at 9 (citing *Frederick v. Garcia*, 179 N.E.3d 917, 928–29 (Ill. App. Ct. 2020)).

The Court agrees with Amazon for several reasons. First, "[f]ederal courts sitting in diversity apply state substantive law and federal procedural law under the eponymous *Erie* doctrine." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (cleaned up); *see also Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018); *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021). So, in this diversity action, while Illinois law provides the substantive law, the propriety of a preliminary injunction presents an issue of procedure, governed by the federal rules. *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) ("The propriety of a preliminary injunction, of course, is to be determined by the rules and decisions of federal courts."); *see also Outsource Int'l Inc. v. Barton*, 192 F.3d 662, 673–74 (7th Cir. 1999) (Posner, J. dissenting) ("As a detail, I note that the court assumes that state rather than federal law governs the standard for the grant or denial of a preliminary injunction. Not so; it is federal law."); *System Operations, Inc. v. Sci. Games Dev. Corp.,* 555 F.2d 1131, 1141 (3d Cir. 1977) (although the right upon which the cause of action is based on is state-created, "Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunction"); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991) (same); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (same); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991); *Equifax Servs., Inc. v. Hitz,* 905 F.2d 1355, 1361 (10th Cir. 1990); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2943 (3d ed. 1998). Here, that means that

Rule 65(a) of the Federal Rules of Civil Procedure governs Madden's request for a preliminary injunction. Under federal law, "unless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief." *Bedrossian v. N.W. Meml. Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005).

Second, the Enforcement Statute itself does not dispense with the irreparable harm required for an injunction for private litigants. 65 ILCS 5/11-13-15. Although the parties focus on specific statutory language that "[a]n owner or tenant need not prove any specific, special or unique damages to himself or his property or any adverse effect upon his property from the alleged violation in order to maintain a suit under the foregoing provisions[,]" which Madden contends dispenses with the requirement of establishing irreparable harm (Memo. at 5) and which Amazon argues goes to a plaintiff's standing and nothing more (Resp. at 8), the parties ignore other plain language in the statute which the Court finds reinforces Madden's requirement to establish irreparable harm. 65 ILCS 5/11-13-15. The Enforcement Statute includes the following language with respect to what an owner or tenant must show: "any owner or tenant of real property, within 1200 feet in any direction of the property on which the building or structure in question is located *who shows that his property or person will be substantially affected by the alleged violation*, in addition to other remedies, may institute any appropriate action or proceeding." 65 ILCS 5/11-13-15 (emphasis added). This language clearly supports that an owner like Madden needs

to show that her property or person is not only affected, but substantially affected, by the alleged CZO violation. Thus, the Enforcement Statute itself does not dispense with the requirements for Madden to establish both irreparable harm and inadequate remedy at law for issuance of a preliminary injunction.[5]

Last, contrary to Madden's suggestion, where a governmental entity, as opposed to a private litigant, seeks injunctive relief pursuant to a statute, then under both federal law and Illinois law, the governmental agency is not required to plead the traditional equitable elements to obtain injunctive relief. *See Word Seed Church v. Vill. of Homewood, Illinois*, 2020 WL 6719030, at *3 (N.D. Ill. Nov. 16, 2020) (citing *United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir. 1987)); *Sadat v. American Motors Corp.*, 470 N.E.2d 997, 1002 (Ill. 1984). This is confirmed by the cases Madden herself cites to, all of which were brought by governmental entities and not private litigants. *See*, *e.g.*, *Village of Riverdale*, 777 N.E.2d at 688 ("Where, however, an injunction is sought by *a public official or body* pursuant to express authorization of a statute, the requirements of the statute control rather than those traditional matters to which we have referred.") (emphasis added). Madden has not identified any authority that supports the proposition that the Enforcement Statute obviates

---

[5]Even if the language pointed to by Madden went to more than a plaintiff's standing (which, in the absence from any authority from Madden, the Court is not convinced of), it does not conflict with this finding, as a plaintiff could show that he or she was substantially affected in some way (e.g. changing traffic patterns involving freight trucks from operation of the Facility) by the alleged CZO violation, but could still bring the suit even if all owners within the required vicinity were similarly affected (meaning there are no specific, special, or unique damages to the plaintiff), and if the plaintiff's property itself is not affected.

her need, as a private litigant, to establish each element for preliminary injunctive relief.

In sum, Madden must satisfy all of the traditional elements under federal law for the issuance of a preliminary injunction. *See id.*

The Court now turns to those factors. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (cleaned up). In federal court, to obtain a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if the relief is not granted. *See Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 80 F. Supp. 3d 829, 833 (N.D. Ill. 2015) (citing *Smith v. Executive Dir. Of Ind. War. Mem'ls Comm'n*, 742 F. 3d 282, 286 (7th Cir. 2014)). "If the plaintiff establishes these threshold requirements, then the court must balance the equities, weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public—including third parties—if it is granted." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023).

The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citing *Planned Parenthood, of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of*

*Health*, 896 F.3d 809, 816 (7th Cir. 2018)). Finally, in balancing the harms, the Court must consider the interests of non-parties in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## Analysis

### I.     Likelihood of Success on the Merits

The Court begins its analysis with whether Madden has established a likelihood of success on the merits. To establish a likelihood of success on the merits, the movant need not show that it will definitely win the case. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). But a mere "possibility of success is not enough" and "neither is a better than negligible chance." *Id.* at 762 (cleaned up). A strong showing of likelihood of success on the merits normally includes the movant showing how he or she proposes to prove the key elements of its case. *Id.* at 763.

Madden argues that she is likely to succeed on the merits that the Facility is in violation of the CZO. Memo at 6–8. Madden points out that the developer of the Facility in its building permit application stated that Facility would be used, "for the receiving, storage, and shipping of commercial products" and "[r]eceiving, storage, and shipping of commercial products." Memo at 6–7. The CZO, submits Madden, defines a "Freight Terminal" as "[a] building or area in which freight is collected and/or stored for in intrastate or interstate shipment." [*sic*]. Memo at 7 (quoting CHICAGO ZONING ORDINANCE AND LAND USE ORDINANCE, tit. 17, ch. 17-17-0105-E(3) (2023)). Although "freight" is not defined in the CZO, notes Madden, the CZO provides that undefined words have the meaning given in the latest edition of Merriam

Webster's Collegiate dictionary. *Id*. Madden contends that the latest edition of the Merriam Webster's Collegiate dictionary defines freight, as either "the compensation paid for the transportation of goods," or "cost," or "goods to be shipped." *Id*. It is this last definition, argues Madden, that applies here. Memo. at 7. The CZO, according to Madden, requires that any property to be used as a "Freight Terminal" secure a special use permit in order to operate. Applying the plain meaning of Freight Terminal, argues Madden, it is evident that Amazon uses the Facility as a Freight Terminal. *Id*.

Amazon counters that Madden cannot demonstrate any chance of success and thus fails to satisfy the first prong. Resp. at 10. The City of Chicago, points out Amazon, in issuing its permit, recognized that Amazon intended to use the Facility as a "Warehouse," which is permitted as of right under the PMD9 zoning classification. *Id*. at 10–11. This right includes a "fulfillment center." *Id*. at 11 (citing § 17-17-0105-E of the CZO). Turning to the dictionary definition of the term "fulfillment center," "as a place where goods are stored, packed, and sent to customers who have ordered them," Amazon insists that its use of the Facility is permitted as of right under the CZO. *Id*. at 11 (citing "fulfillment center" as defined by the Cambridge English Dictionary).[6] Amazon further cites to the Merriam-Webster definition of "warehouse" as "a structure or room for the storage of merchandise or commodities" and the Cambridge Dictionary definition as a "large building for storing

---

[6]The Merriam-Webster Collegiate dictionary does not define "fulfillment center" as its own term.

things before they are sold . . . ." Resp. at 11. On this basis, Amazon posits it has been issued all necessary zoning, building, and occupancy approvals for the Facility. *Id.*

In any event, argues Amazon, accepting Madden's interpretation and construction of the CZO would lead to "nonsensical" results. Resp. at 11–12. For example, it would render "fulfillment center"—a use specified in the CZO as permitted without a special use permit—as "superfluous," and "[e]ffect should be given to the intention of the drafters by concentrating on the terminology, its goals and purposes, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance." *Id.* (quoting *Monahan v. Village of Hinsdale*, 569 N.E.2d 1182, 1188 (Ill. App. Ct. 1991)). If the Court finds any ambiguity in the CZO, argues Amazon, it should defer to the City's reasoned determination. Resp. at 12.

In reply, Madden argues that the CZO is unambiguous and reiterates that a "Freight Terminal" is "[a] building where freight is collected and/or stored *for* . . . intrastate or interstate shipment," and that is precisely Amazon's use of the Facility. R. 12, Reply at 6. Alternatively, posits Madden, if there is a conflict between "Freight Terminal" and "fulfillment center," under the CZO, the more restrictive provision controls. Reply at 6–7 (citing Section 17-1-1002 ("[I]f the provisions of this Zoning Ordinance are inconsistent with one another, or if they conflict with provisions found in other adopted ordinances or regulations of the city, the more restrictive provision will control. The more restrictive provision is the one that imposes greater restrictions or more stringent controls on development.")). On that basis, argues Madden,

14

"Freight Terminal" would apply, and the special use permit would be required. *Id.* at 8–9.

Finally, Madden asserts that, contrary to Amazon's suggestion, there will be no "nonsensical" results by following the requirements of the CZO. Reply at 7–8. Madden highlights that other sections of the CZO apply to other types of businesses receiving, and then selling or distributing those goods, but that Amazon's permit is of the type listed under "Warehousing, Wholesaling, and Freight Movement," and although Amazon contends that its Facility is a "fulfillment center," this in itself does not mean the Facility does not fall under the definition of Freight Terminal. *Id.* at 8. Ultimately, there is no ambiguity in the CZO, argues Madden, although there is a conflict—e.g. whether "fulfillment center," or "Freight Terminal," or both, applies— however the CZO accounts for that scenario (*see* Section 17-1-1002) and the more restrictive provision—for Freight Terminal—necessarily applies. *Id.* at 9.

The Enforcement Statute provides:

> In case any building or structure . . . is constructed, . . . or any building, . . . or land, is used in violation of an ordinance, . . . the proper local authorities of the municipality, or any owner or tenant of real property, within 1200 feet in any direction of the property on which the building or structure in question is located who shows that his property or person will be substantially affected by the alleged violation, in addition to other remedies, may institute any appropriate action or proceeding . . . (3) to prevent any illegal act, conduct, business, or use in or about the premises, or (4) to restrain, correct, or abate the violation.

> In any action or proceeding for a purpose mentioned in this section, the court with jurisdiction of such action or proceeding has the power and in its discretion may issue a restraining order, or a preliminary injunction, as well as a permanent injunction, upon such terms and under such conditions as will do justice and enforce the purposes set forth above.

65 ILCS 5/11-13-15.

"The purpose of Section [11-13-15] is to empower private landowners to bring suit against private violators and thus afford relief to private landowners in cases where municipal officials are slow or reluctant to act, or where their actions do not protect the landowners' interests." *Ryan v. City of Chicago*, 147 N.E.3d 887, 889 (Ill. App. Ct. 2019) (cleaned up).

Like any other statutory interpretation case, the Court's analysis begins, as it must, with the text of the CZO.[7] *See Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020). Under Illinois law, ordinances "are interpreted according to the traditional rules of statutory construction. Illinois directs courts to ascertain and give effect to the intent of the enacting body, the clearest indicator of which is the language of the ordinance itself." *Pro's Sports B. & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 871 (7th Cir. 2009) (cleaned up). The Court will only look to other aids of construction if there is an ambiguity in an ordinance. *See Carter v. Tennant Co.*, 383 F.3d 673, 682 (7th Cir. 2004) (citing *In re D.L.*, 727 N.E.2d 990, 994 (2000)) ("If the statutory language is clear and unambiguous, then there is no need to resort to other

---

[7]Amazon does not dispute Madden's standing to bring this lawsuit, e.g. that she is an owner or tenant residing within 1,200 feet of the Facility. *See* 65 ILCS 5/11-13-15. However, in a footnote, Amazon suggests that Madden has not served the City with the Complaint for standing purposes, as required. Resp. at 8, n. 4. However, Amazon fails to argue what, if any, effect this has on the lawsuit, and the Court need not construct or hypothesize any argument for Amazon. *White v. Richert*, 2019 WL 4062539, at *9 (N.D. Ill. Aug. 28, 2019) (citing *Pelfrense v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. We will not do his research for him.")). Moreover, "[a]rguments in footnotes are typically waived." *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016); *see also* J. Valderrama Standing Order, Memorandum of Law Requirements ("Generally, the Court will not consider substantive arguments contained in footnotes.").

aids of construction.") If an ordinance is clear and unambiguous, the Court must "give it effect as written, without reading into it exceptions, limitations or conditions that the [the City Council] did not express." *In re D.L.*, 727 N.E.2d at 994 (cleaned up).

There are a few provisions at play in this case. CHICAGO ZONING ORDINANCE AND LAND USE ORDINANCE, tit. 17, ch. 17-17-0105 (2023). Section 17-1705-0105-E and 17-1705-0105-E(3), "Warehousing, Wholesaling and Freight Movement," provides, in relevant part:

> Storage, wholesale sales and distribution of materials and equipment. Typical uses include storage warehouses, moving and storage firms, fulfillment centers, trucking or cartage operations, truck staging or storage areas, wholesale sales of materials and equipment to parties other than the general public and the following specific use types:
>
> . . .
>
> > 3. Freight Terminal. A building or area in which freight is collected and/or stored for in intrastate or interstate shipment.

The CZO also clarifies "[t]ypical uses cited in the description of Use Categories are not intended to be exclusive or restrictive." *Id.* § 17-17-0101-C "Typical Uses."

The CZO includes rules of interpretation. Specifically, "[t]he language of the Zoning Ordinance must be read literally. Regulations are no more or less strict than stated. Words listed in Chapter 17-17 have the specific meaning assigned, unless the context expressly indicates another meaning. Words that are not defined in Chapter 17-17 have the meaning given in the latest edition of Merriam Webster's Collegiate Dictionary." CHICAGO ZONING ORDINANCE AND LAND USE ORDINANCE, tit. 17, ch. 17-17-0101-C "Meanings and Intent." As Madden points out, the CZO also accounts for a scenario where there is a conflict or inconsistency within the provisions of the CZO,

17

and in that circumstance the more restrictive provision—"the one that imposes greater restrictions or more stringent controls on development"—applies. *Id.* § 17-1-1002 "Conflict with Other City Regulations."

"Freight" is undefined in the CZO. The latest edition of the Merriam Webster Collegiate Dictionary defines "freight" as: "(1)(a) the compensation paid for the transportation of goods; (1)(b) COST; (2)(a) goods to be shipped: CARGO; (2)(b) LOAD; BURDEN; (2)(c) MEANING 3, SIGNIFICANCE, or (3)(a) the ordinary transportation of goods by a common carrier and distinguished from express; (3)(b) a train designed or used for such transportation." *Freight*, MERRIAM-WEBSTER.COM, https://unabridged.merriam-webster.com/collegiate/freight (last visited Dec. 11, 2023).

The parties dispute the meaning of "freight" as used within the definition of "Freight Terminal."[8] The parties agree that if the Facility is a Freight Terminal, then a special use approval is required. Mot. at 2–3; Resp. at 4. Here, there is no dispute that Amazon does not have a special use permit to operate the Facility. Answer ¶ 44. Therefore, if the Facility is a "Freight Terminal," then it is operating in violation of the CZO. While a close call, following the principles of statutory interpretation, the Court agrees with Madden's interpretation of "Freight Terminal." The description of the Facility by Amazon itself (*see* Answer at 30 "Defendant will receive and store

---

[8]Amazon purportedly disagrees with how the CZO defines a "Freight Terminal," arguing that it is commonly understood to mean "a structure equipped for transshipment between at least two transport modes and for temporary storage of freight such as ports, inland ports, airports and railroad terminals." Resp. at 12 (citing Law Insider). However, the CZO does not contemplate looking to the resource of "Law Insider" for definitions, and "Freight Terminal" itself has a defined meaning within the CZO.

goods at the facility and deliver them intrastate") is consistent with the definition of "Freight Terminal" within the CZO ("A building or area in which freight is collected and/or stored for in intrastate or interstate shipment."). Deferring to the Merriam-Webster definition as the CZO requires, the Court accepts Madden's argument that "freight" has the meaning, "goods to be shipped."

Although Amazon invites the Court to consider extrinsic evidence to construe the plain meaning of the statute, the Court declines the invitation as there is no ambiguity in the CZO which would permit the Court to do so. *See Carter*, 383 F.3d at 682. Amazon contends that it was told by the City that, "[i]f trucks delivered products to a warehouse for storage and, from that point, vans operated by or for Amazon delivered those products to area consumers, the use would be considered a permitted 'Warehouse[,]'" and conversely that "truck to truck" transfers would be considered by the City to be a "freight terminal." Resp. at 4–5. At best, there is an inconsistency in that Amazon's Facility may be more than one type of business as described in Section 17-17-0105-E. For example, the Facility may be both a Warehouse and a Freight Terminal, yet the CZO accounts for such a possibility and mandates the more restrictive provision apply. *See* CHICAGO ZONING ORDINANCE AND LAND USE ORDINANCE, tit. 17, ch. 17-17-1002 (2023). Further, the CZO also specifies that the use categories "are not intended to be exclusive or restrictive," e.g. the Facility may be a fulfillment center, warehouse, and/or Freight Terminal. *Id.* § 17-17-0101-C "Typical Uses." This does not create any ambiguity. Here, without dispute, the most

restrictive provision would be the Freight Terminal, which requires a special use permit.

Alternatively, Amazon asks the Court to defer to the City's approval of the Warehouse permit to Amazon. But the Court cannot defer to the City's interpretation in the face of an unambiguous ordinance. *See Monahan,* 569 N.E.2d at 1188 (courts will defer to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute). Not only that, but to do what Amazon suggests would add conditions or requirements to the CZO that do not exist, e.g. "[a] building or area in which freight is collected and/or stored for *truck to truck transfers* in intrastate or interstate shipment." (emphasis added). There is no such requirement in the CZO.

Thus, the Court finds Madden has established a likelihood of success on the merits.

## II.    No Adequate Remedy at Law and Irreparable Harm

Next up is whether Madden has established that she lacks an adequate remedy at law and that she will be irreparably harmed without the requested preliminary injunctive relief.

Madden maintains that she "has no adequate remedy at law because the harm is in the nature of the denial of a legal right, not necessarily damages in the form of nuisance." Memo. at 10. This legal right, asserts Madden, without citation to any applicable law or persuasive authority, is defined by the Enforcement Statute itself as the right to be free from ordinance violations on proximate properties. *Id.*

Regarding irreparable harm, Madden argues that her proximity to the Facility is an ongoing harm due to Amazon's violation of the zoning ordinance. Memo. at 9 (citing *Lucas v. Peters*, 741 N.E.2d 313 (Ill. App. Ct. 2000); *Bollweg v. Richard Marker Assoc., Inc.*, 818 N.E.2d 873 (Ill. App. Ct. 2004)). Last, Madden posits that because Amazon did not seek and obtain a special use permit, Amazon failed to provide notice to residents and she could not participate in a public hearing, which she describes as a quasi-judicial proceeding. Memo. at 9–10 (citing *S. Shore Jewelry & Loan, Inc. v. City of Chicago*, 2016 IL App (1st) 150370, ¶ 26 (unpublished)).

Amazon's response fails to address Madden's argument regarding an inadequate remedy at law and therefore, Amazon waived any response. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). No matter, as the Court finds that Madden has met her burden of establishing an inadequate remedy at law. Specifically, the Enforcement Statute does not provide for money damages (only the recovery of her attorney fees), only injunctive relief. 65 ILCS 5/11-13-15. Thus, there is no adequate remedy at law for the specific relief sought in her Motion.[9]

Instead, Amazon focuses its response on the irreparable harm factor and argues that Madden failed to submit any evidence of irreparable harm, or to cite to any authority in support of her argument, which warrants denial of her Motion. Resp. at 13–14 (citing *DM Trans, LLC v. Scott*, 38 F. 4th 608, 617–18 (7th Cir. 2022)). Amazon also cites to *Cook Cnty. Republican Party v. Pritzker*, 487 F. Supp. 3d 705,

---

[9]In her Motion, Madden mentions nuisance actions, which, presumably, would afford Madden relief should she experience specific, tangible harm from the ongoing operation of the Facility.

714–715 (N.D. Ill. 2020) to support its argument that Madden's harms are merely speculative, which is insufficient to meet this requirement.

The Seventh Circuit has explained that "[h]arm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans*, 38 F. 4th at 618. The irreparable harm must also be likely. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). "That is, there must be more than a mere possibility that the harm will come to pass." *Id.* As discussed in the Legal Standard section, *supra*, Madden is required to establish irreparable harm. *See Cintas Corp. v. Perry*, 2004 WL 2032124, at *15 n. 18 (N.D. Ill. Aug. 20, 2004) (reasoning that federal law applies to determine whether plaintiff established irreparable harm for purposes of a preliminary injunction); *see also Budget Rent A Car Corp. v. Harvey Kidd Automotive*, 249 F. Supp. 2d 1048, 1049–50 (N.D. Ill. 2003) ("[W]hether [plaintiff] has established irreparable harm is not governed by Illinois law and its presumptions, but rather by federal law.").

Here, the Court agrees with Amazon and finds that Madden has not established irreparable harm. The Illinois cases cited by Madden did not apply the federal preliminary injunction standard, and for that reason they are inapposite. Further, those cases are factually distinguishable. In *Lucas*, the court found that the defendant mental health authorities deprived plaintiffs—criminal defendants found not guilty by reason of insanity—their procedural due process rights by not performing individualized assessments regarding their placement in treatment

22

facilities. 741 N.E.2d at 323. The court rejected the defendants' argument that the harm claimed by plaintiffs was speculative, finding that a continuing violation of the United States Constitution in violation of procedural due process under the Fourteenth Amendment was a *per se* irreparable harm for injunction purposes. *Id.* at 325. In *Bollweg*, the court found that the plaintiff-homeowner had established tangible, ongoing harm based on expert testimony that development would increase water flow onto the plaintiff's property. 818 N.E.2d at 887. Neither scenario is akin to the facts in this case, and the Court finds Madden has not made a sufficient showing of irreparable harm.

The Enforcement Statute itself requires Madden demonstrate that either her property, or person, "will be substantially affected by the alleged violation," however, her Motion does not include a showing of how Amazon's zoning violation affects her or her property, let alone how it substantially affects her or her property. 65 ILCS 5/11-13-15. Madden merely summarily argues that as a proximate resident to the Facility, she has shown irreparable harm in the context of the Facility's ongoing operation without the permit required by the CZO. True, Amazon's permit request did not undergo the process required for a Freight Terminal, but Madden has not specified how the continued operation of the Facility irreparably harms her, and the Court declines to find that Amazon's failure to obtain a permit which resultingly denied Madden and other residents the ability to participate in a zoning hearing process as a resident is analogous to, for example, the denial of a constitutional right. As irreparable harm requires a showing that Madden's remedies are "seriously

deficient as compared to the harm suffered," and the Court finds that Madden has failed to meet this requirement. *DM Trans*, 38 F. 4th at 618.

Thus, Madden has failed to meet the threshold showing for a preliminary injunction. *DM Trans*, 38 F.4th at 621 (finding district court did not abuse its discretion in denying preliminary injunction where it found no adequate remedy at law and no irreparable harm); *see also Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (cleaned up) ("A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.").

Here, as Madden has failed to meet the threshold showing for issuance of a preliminary injunction, the Court need not proceed to the balancing analysis. *See Cook Cnty. Republican Party*, 487 F. Supp. 3d at 721. However, while the Court could end its analysis at this juncture, for the sake of completeness, the Court next addresses the balance of the harms.

### III. Balance of the Equities and Public Interest

The balancing of equities requires the Court to weigh the harm to Madden in denying the preliminary injunction against the harm to Amazon if the preliminary injunction were granted. This involves considering the public interest and effects of the preliminary injunction on "people and institutions that are not parties to the case." *Cassell*, 990 F.3d at 545.

In her opening brief, Madden fails to address the balancing of harms factor. Amazon, on the other hand, argues that the balancing test favors denial of the preliminary injunction, especially given the timing of the requested injunction

relative to Amazon's ongoing operations at the Facility. Resp. at 14 (citing, among other cases, *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, (N.D. Ill. 2011)). Relatedly, Amazon contends that Madden should be estopped from seeking the preliminary injunctive relief at this point in time given the development costs incurred by Amazon ($84 million) and because Madden waited to bring the lawsuit until the planning opening date of the Facility. *Id.* at 15 (citing, among other cases, *Cities Services Oil Company v. City of Des Plaines*, 171 N.E.2d 605, 608 (Ill. 1961)).

In reply, Madden argues that the balancing test does not favor Amazon because Amazon's harms are either speculative, or of its own making. Reply at 11–13. Madden contends that any time value and redevelopment efforts, or removal of jobs, from the Facility, are speculative harms premised on the assumption that a special use permit would not issue, and thus Amazon will only have operational losses. *Id.* at 11–12. Madden points the finger at Amazon in choosing to open the Facility only when litigation was filed. *Id.* at 12. In reply to the estoppel argument, Madden maintains Amazon fails to meet the elements for equitable estoppel. *Id.* at 14–15.

In general, the Court will not consider an argument or case asserted for the first time on reply. *See Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009). Here, however, the Court will consider Madden's arguments responsive to Amazon's arguments on balancing of harms and estoppel to the extent it aids the Court in its analysis of this second step in considering whether a preliminary injunction should issue.

As an initial matter, the Court addresses whether Madden has timely challenged the operation of the Facility. As other courts in this District have recognized, a "lengthy, unexplained delay in seeking relief calls into question how urgent the need for preliminary equitable relief really is." *Finch v. Treto*, 606 F. Supp. 3d 811, 836 (N.D. Ill. 2022), *aff'd in part, dismissed in part*, 82 F.4th 572 (7th Cir. 2023) (cleaned up).

Madden contends the scope of the Facility's operations could not have been known before the Facility opened, although by her own citation to many news sources, the development and opening of the Facility was publicized for several years prior to when she filed the lawsuit. Conversely, Amazon argues Madden unreasonably delayed in bringing this lawsuit. Resp. at 14–15. Here, the factual record supports that Madden filed her verified complaint on August 29, 2023, a motion for preliminary injunction on September 15, 2023, and that on September 27, 2023 the Facility began accepting shipments. *See* Compl.; Mot.; Resp. at 5. On this record, the Court cannot find that Madden unreasonably delayed seeking injunctive relief.

The Court now turns to the balancing of the harms. The Court previously described the generalized harm as alleged by Madden, and at this point, the Court considers the purported harm to Amazon in issuing the injunction. Amazon contends that granting the injunction would result in operational losses of approximately $750,000 to $2.7 million per week, at a minimum, relating to projected volume of sales losses only, stemming from a cessation of operations at the Facility, and subject to

Amazon receiving a special use permit.[10] Resp. at 7. In support, Amazon provides the affidavit of Remy which details these projected operational losses. Remy Decl. ¶ 14. It can hardly be disputed that cessation of operations at the Facility would impact not just Amazon, but third parties as well, including Amazon's workforce at the Facility and Amazon customers. *See id.* While Madden paints Amazon's harm as speculative, Madden does not advance any compelling argument in support of that contention. In fact, Madden seemingly recognizes that cessation would cause "the alleged operational losses." *See* Reply at 12.

Although the exact amount of those operational losses is unknown, the projected losses would be significant even if the permitting process took only a few weeks. Without passing any judgment on whether and/or when Amazon would be able to obtain the special use permit if an injunction did issue, the Court finds in balancing the harm to Madden in denying the preliminary injunction against the harm to Amazon if the preliminary injunction were granted, the balance clearly favors Amazon. *See, e.g., U.S. Army Corps of Eng'rs*, 667 F.3d at 795–96 (reasoning that "the preliminary injunction the [plaintiffs] have requested would impose substantial costs, yet given the current state of the record, we are not convinced that the preliminary injunction would assure much of a reduction in the" complained of harm, e.g. the "risk of the invasive carp establishing themselves in Lake Michigan in the near future" and therefore finding that the balance of harms favors defendants).

---

[10]Amazon also argues that it would need to pay for property taxes, site management fees, and utilities, throughout a cessation of operations, but it does not allocate a number to these projected costs. Resp. at 7.

Ultimately, the Court finds that Madden has failed to establish irreparable harm, such that a preliminary injunction is not merited but, even if she had, the balancing of equities clearly favors denial of the preliminary injunction given the quantifiable and significant operational losses Amazon would incur weighed against the intangible harm to Madden of hypothetically participating in a zoning board approval process. Even where a plaintiff has made a showing of likelihood of success on the merits, inadequate remedy at law, and irreparable harm, the Seventh Circuit has upheld denial of a preliminary injunction where the balance of equities favors defendant. *See Finch*, 82 F.4th at 578; *see also U.S. Army Corps of Eng'rs*, 667 F.3d at 795–96 ("That the balance of harms at this stage of the litigation favors the defendants might be enough by itself to support a conclusion that preliminary relief is not warranted, even though we have concluded that the states have demonstrated a likelihood of success on the merits and a threat of irreparable harm.")

## Conclusion

For the foregoing reasons, Madden's motion for preliminary injunction is denied.

On or before January 4, 2024, the parties shall file a joint initial status report. A template for the Joint Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Valderrama's name and then again on the link entitled "Joint Initial Status Report." The parties are further ordered to review all of Judge Valderrama's standing orders and the information available on his webpage. Any nongovernmental corporate party

that qualifies under the Rules is reminded of the requirement to file a disclosure statement under Federal Rule of Civil Procedure 7.1/N.D. Ill. Local Rule 3.2.

Dated: December 21, 2023

United States District Judge
Franklin U. Valderrama